# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

STEVEN SALYERS,                                    Case No. 1:13-cv-392

               Plaintiff,                    Dlott, J.
     v.                                            Bowman, M.J.

BRENNAN BUILDERS, INC., et al.,

               Defendants.

## REPORT AND RECOMMENDATION

This case was recently referred to the undersigned magistrate judge for a report and recommendation on a pending motion for summary judgment. Having reviewed the motion, Plaintiff's response, and Defendant's reply, as well as the evidence of record and controlling legal authority, I recommend that Defendants' motion be granted.

### I.  Factual and Procedural Background

Plaintiff Steven Salyers filed suit in the Hamilton County Court of Common Pleas in January 2012 against his former employer, Brennan Builders, Inc. ("BBI" or the "Company"), alleging breach of contract, promissory estoppel, and fraud. In June 2013, nearly nine months after voluntarily dismissing his state court case without prejudice in September 2012,[1] he filed a new complaint against BBI in federal court,[2] reinstating his prior claims and adding a claim for wrongful termination in violation of public policy. After learning that BBI had been formally dissolved in early 2013, Plaintiff amended his complaint in December 2013, adding claims against Defendant Terry Brennan in his

---

[1] Because the parties exchanged documents and both Plaintiff and Brennan were deposed in the state court action, the parties agreed to limit new discovery in this federal case.
[2] Federal jurisdiction is based on diversity of citizenship, as Plaintiff relocated to Michigan following his termination.

individual capacity.

BBI was incorporated in 1969 as a home remodeling business.  Brennan became sole owner and President of BBI in the early 1970's.  In the 1980's, BBI went into the general contractor construction business, focusing on automobile dealerships. Brennan's wife Vickie was the Vice-President and Secretary of BBI, as well as a long-term employee of the Company. By the time Plaintiff became associated with BBI in 2006, BBI was a successful general contractor business in the Greater Cincinnati area, counting some of the largest dealership groups in the area among its clientele.

Plaintiff and Defendant met for the first time in 1998 in connection with a construction project at Glenway Chevrolet in Cincinnati.  BBI was serving as the general contractor and Plaintiff, then living in Michigan, was a regional project manager for General Motors ("GM").  Plaintiff was employed by the Christman Company, but had been assigned to GM for the Glenway project.  Plaintiff and Defendant worked together for about a year and a half.  Plaintiff testified that Brennan was so impressed with Plaintiff's work that near the end of the job, Brennan offered to hire Plaintiff at double his salary, and if that were not sufficient, he offered to give Plaintiff his house because he planned to move to a new one.  (Doc. 17 at 17-18).  Plaintiff testified that Brennan told him that he had no children, and had been looking for someone to take over the business, which Plaintiff interpreted at the time as a "possibility."  (Doc. 17 at 19-20).

Plaintiff testified that he voluntarily resigned from the Christman Company in 2000 after he received a third DUI and lost his driving privileges, even though Christman tried to talk him into staying.  In 2003, Plaintiff testified that Brennan again offered Plaintiff a job, confirming at the time that he was still willing to transfer the business to

Plaintiff.  (Doc. 17 at 43-44).  Plaintiff expected Brennan to get back to him at the time, but Defendant did not follow through.[3]  (*Id.* at 44-46).  Plaintiff remained unemployed from the end of 2000 until he was hired by BBI in 2006, aside from jobs that he performed through a company he started himself, called Premium Builders.  However, Plaintiff was unemployed and received no income from Premium Builders in 2005.  Plaintiff's driving privileges were partially restored in November 2005.

Plaintiff and Defendant maintained a personal relationship through the years.  In January or February 2006, while Plaintiff was returning to his Michigan home after visiting relatives in South Carolina, he and Defendant met to discuss a possible employment opportunity with BBI.  They agreed that Plaintiff would begin employment at BBI for a six-month "trial" period, and Brennan confirmed his intention to transfer BBI to Plaintiff over time.  Plaintiff testified that he "expected that within six months [Brennan] would have a letter of intent" that would outline the transition of the business from Defendant to Plaintiff "over the next year and a half or two years."  (Doc. 17, Salyers Depo. at 54-55). Plaintiff testified that he accepted BBI's offer of employment based in part on the representation that 100% of BBI would be transferred to him.  However, Plaintiff admitted that he did not know details such as whether Brennan would be involved once Plaintiff owned 100% of BBI, how Brennan would be compensated if he remained involved in the Company, how long the transition process would last, or what would happen to the physical assets of the Company.

Brennan and Plaintiff exchanged letters outlining the compensation and terms for Plaintiff's six month "trial" period of employment, but their writings made no reference to

---

[3]In contrast to Plaintiff's recollection, Defendant testified that he would have hired Plaintiff to serve as project manager in 2003 but that, because of Plaintiff's loss of driving privileges, Plaintiff could not perform that job. (Brennan Dep. at 42-43).

3

any ownership opportunities.  Brennan's letter to Plaintiff includes terms of his salary, vehicle cost allowance, health care coverage, and relocation expenses.  It states: "Following the six-month trial period we will discuss other options."  (Doc. 17-1, Ex. 1). Plaintiff telephoned Defendant to express disappointment with the amount of salary offered, but did not say anything about the omission of the previously discussed ownership opportunity.

On March 9, 2006, Plaintiff wrote Defendant to accept his offer, stating:  "I accept your offer of employment contingent on it being a six-month trial basis, and suggest a start date of Monday, April 3, 2006."  (Doc. 17-1 at Ex. 2).  He understood that, after the six-month "trial" period expired, there was "a possibility" that his employment with BBI could end.  (Doc. 17 at 63-64).  He enclosed a completed employment application that contained the following language in bold:

> **I…understand and agree that no representatives of the Company ha[ve] any authority to enter into any agreement for employment for any specified period of time, or to make any agreement contrary to the forgoing, unless it is in writing and signed by an authorized Company representative.**

(Doc. 17-1 at Ex. 4).  By letter dated March 21, 2006, Defendant wrote Plaintiff to confirm receipt of the employment forms as well as agreement with Plaintiff's start date. Defendant's letter states:  "We both understand that this is a six month trial period and your first review will be at the end of the six months.  This is a new beginning for you and I look forward to a long and prosperous relationship for us both."  (Doc. 17-1 at Ex. 3).  Plaintiff never saw any writing by anyone at BBI that guaranteed him employment for any period of time.  Plaintiff testified that it "bothered" him that Brennan had neglected to include anything in writing about ownership in March 2006, but Plaintiff did

4

not ask him at the time.

After he had accepted BBI's offer of employment, but prior to his start date with BBI, Plaintiff learned of an opening at Turner Construction ("Turner").  He was twice invited to interview for the position but declined, without informing Brennan of the opportunity.  Plaintiff was never offered a job at Turner.   In fact, during the entire time period of his employment with BBI, Plaintiff never sought employment anywhere else, and received no other job offers.

After about ten months, in early 2007, BBI offered Plaintiff three separate employment package options, each of which equaled over $150,000 in annual compensation, more than Plaintiff had been paid by any previous employer, and representing a significant raise to Plaintiff. None of the packages mentioned anything about ownership in BBI or permanent employment with BBI.  In a February 26, 2007 responsive letter, Plaintiff thanks Brennan for the opportunity to work for BBI, but complains that he has "been working without an agreement since October."[4] He then references his hope for a future agreement:

> Even though we have spoke often and at great length about the future, nothing specific has transpired.  I have and will continue to operate in good faith, but request that we begin working together on creating the new business entity and take the necessary steps to make this happen in a mutually agreed upon amount of time.
>
> Until then, I would prefer Employment Package Option #3….

(Doc. 17-1 at Ex. 8).

Over time, Plaintiff testified that Brennan altered Plaintiff's understanding of their agreement concerning the transfer of BBI from Brennan to Plaintiff from an arrangement

---

[4]The "October" reference corresponds with the end of the prior written offer of a six month "trial" period that began with Plaintiff's employment in April.

whereby Plaintiff would gain 100% of BBI, to some type of joint venture or "LLC" in which he and Brennan (and/or their wives) would share ownership. (Doc. 17 at 112-113). Plaintiff testified that he still believed that he eventually would gain 100% ownership, but that he believed that Defendant was buying time. Plaintiff testified that he wanted to review the document that Defendant promised to produce to him prior to raising any issues about changes to the original transition agreement. (Doc. 17 at 117-118, 121).

Plaintiff alleges that Brennan repeatedly made oral assurances throughout Plaintiff's employment, from 2006 through 2010, that a written agreement would be forthcoming.[5] However, no other person ever heard Brennan make the alleged offers of ownership opportunities to Plaintiff, and Brennan himself never acknowledged after Plaintiff began his employment that he and Plaintiff had reached any specific agreement whereby Brennan would give 100% of his company to Plaintiff without any additional consideration. (Doc. 17 at 152-153).

When asked for his understanding in 2007 of the details of the new limited liability company that Defendant allegedly promised to form with him, Plaintiff testified:

> A:   [T]he structure of the LLC would have language included in it associated with a timeframe that they [the Brennans] would phase out and we would take over the rest of the ownership.
>
> Q:  What would be that timeframe?
>
> A: Two years.  Five years.  I don't know.  You know, I was patient.
>     …
> Q:  What [were] the terms in February of 2007…was it to create a new business entity or hundred percent ownership in [BBI]?

---

[5]Brennan vehemently denied making any such promises or representations to Plaintiff, but on summary judgment, this Court has construed all factual discrepancies in favor of the Plaintiff.

A:  It was creating a new business entity.

Q:  And…when was that agreement entered into?

A:  That's hard to say.

(Doc. 17 at 115-117).  Plaintiff wrote in contemporaneous private notes to himself in early 2007, less than a year after starting employment at BBI, that he had a "sense of anxiety" about whether his relationship with Brennan would work out.  He testified that the relationship was "complicated," and that he had started to distrust Brennan.  (*Id.* at 104, 119-120).  One note documents a conversation in late February 2007 in which Plaintiff "told [Brennan] that aside from us entering into any agreement (he refers to as the "LLC") until the "LLC" is drafted, that I have no idea what the terms/amounts are going to be…."  (Doc. 17-1 at Ex. 9, emphasis added).

In April 2007, an email from Plaintiff to Defendant noted it had been nearly "2 months from the last time that you said you needed two more months to get the LLC drafted."  (Doc. 17-1 at Ex. 10, emphasis original).  The same email indicated that Plaintiff would not move his family from Michigan to Cincinnati "until we have an agreement that goes into a lot more detail than I am currently operating under, and one much closer to the one you have described numerous times previously."  (Doc. 17-1, Ex. 10).  A handwritten note by Plaintiff dated April 23, 2007 states that as Defendant "WAS LEAVING THE OFFICE FRIDAY 4/20/2007 ≈ 5:30 PM HE STUCK HIS HEAD IN MY OFFICE & SAID:  "UNBEKNOWNST TO YOU, I AM ON THE 4TH DRAFT."  (*Id.*).

In May 2007, Plaintiff wrote Defendant another email, noting Plaintiff's past patience and his request "among other things, a mutually agreed upon time frame for putting your plans for the future in writing," and requesting that Plaintiff "be involved in

that process."  The May email continues:

> …Unfortunately however, it seems that the more I bring it up, the less you say about it.
>
> If you are not capable of a partnership with me, please say so.  I am not capable of being a long term employee for you.  I need to make some final decisions in July.  In order to do so, I need something to review no later than June.

(Doc. 17-1, Ex. 11).  Although Plaintiff never received an agreement from Brennan, he still moved his family to Cincinnati in August 2007.  Plaintiff testified that Defendant's reluctance to discuss the issue made him feel "scared."  (Doc. 17 at 124).

Plaintiff continued to write Defendant in March, April and May 2008 requesting more specifics regarding the establishment of a new business entity and Plaintiff's role in that entity.  (Doc. 17-1 at Exs. 12, 13, 15).  Plaintiff testified that Brennan provided verbal reassurances that he was "still working on the agreement that I knew had morphed out of the transition of ownership over two years into an LLC."

In April 2009, three years after Plaintiff began working for BBI, Defendant contacted his personal banker about the possibility of forming a new LLC.  Plaintiff completed a credit application, which Defendant sent to his banker for review in order to determine Plaintiff's credit worthiness.  The banker determined that Plaintiff was not creditworthy on his own,[6] and the process went no further at the time.  (Doc. 16 at 127-128).  Plaintiff denies that Defendant ever showed him the letter from the banker, or told Plaintiff that he was financially lacking.  (Doc. 17 at 160-162).

A year later in April 2010, Plaintiff hired a lawyer to assist him in preparing documentation to create a new entity to be owned solely by Plaintiff.   Brennan

---

[6] Plaintiff previously had declared bankruptcy.

8

immediately learned that Plaintiff had hired an attorney, and was upset that Plaintiff had involved a third party asking Defendant about his future, but took no adverse action against Plaintiff in the spring of 2010.  (Doc. 16 at 137-138).  Plaintiff's counsel contacted Defendant's counsel and requested a time table as to when documents relating to the proposed new entity, in which Plaintiff would be an owner, would be completed.  In response, Defendant's counsel informed Plaintiff's counsel that neither Defendant nor his counsel were working on any such documentation, but that Brennan might consider some type of sale of BBI if the parties could agree on terms.

By letter of intent drafted by Plaintiff's counsel and dated June 14, 2010, Plaintiff offered to purchase the assets of BBI, with Brennan and his wife remaining involved in the Company as independent contractors.  The offer required Plaintiff to pay a purchase price to Brennan from post-purchase revenues of the Company.  None of those terms had previously been discussed, and Plaintiff viewed them as "very negotiable."  (Doc. 17 at 180).  On August 10, 2010, Plaintiff wrote Brennan another letter in which Plaintiff accused Brennan, among other things, of making a "series of false promises," and asserting that BBI had "liability" with Plaintiff.

Brennan did not agree to Plaintiff's June 2010 Letter of Intent.  At the time he received the August 2010 letter, Brennan had made no decision on whether to continue Plaintiff's employment.  However, around that time, Brennan and his wife began to treat Plaintiff differently and exclude him from day-to-day operations.  In July 2010, Brennan turned down an opportunity to manage a project that Plaintiff would have been capable of doing.  In August 2010, Plaintiff discovered that over 500 of his personal and business emails had been deleted.  At around the same time, Brennan changed the

locks at the BBI office and did not give Plaintiff a new key.

After receiving the August 2010 letter, on September 2, 2010, Brennan submitted a counterproposal to Plaintiff, offering to sell BBI for the lump sum of $1,464,000.00. In the same letter, Brennan informed Plaintiff that should he choose not to accept the proposal, Plaintiff's employment would end, because BBI was winding down its business and would no longer require full-time employees. (Doc. 17-1 at Ex. 19). Plaintiff rejected Brennan's offer, and was terminated at the end of September 2010. Brennan never said anything to Plaintiff that contradicted the written reasons for Plaintiff's termination.

Brennan made no attempts to sell BBI to anyone else. BBI hired no replacement employees and performed less work after Plaintiff's termination, but did complete at least three additional projects in 2011-2012. BBI was formally dissolved in December 2012 or January 2013. At the time of dissolution, no one had any pending claims against BBI.[7] Brennan testified without contradiction that BBI always had its own separate checking account, that Company funds were never co-mingled with his personal funds, and that Company funds were never used to pay personal debts. He also testified that BBI conducted annual directors' meetings attended by the Company's outside CPA, although the meetings were informal in nature. (Doc. 19 at 26-27).

**II. Analysis**

**A. Summary Judgment Standard**

In a motion for summary judgment, a court "must view the facts and any inferences that can be drawn from those facts ... in the light most favorable to the

---

[7]At the time of dissolution, Plaintiff had voluntarily dismissed his state court case.

nonmoving party." *Keweenaw Bay Indian Comm. v. Rising,* 477 F.3d 881, 886 (6th Cir. 2007) (internal quotation marks omitted).  "Summary judgment is only appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Id.* (quoting Fed.R.Civ.P. 56(c))(internal quotation marks omitted). "Weighing of the evidence or making credibility determinations are prohibited at summary judgment-rather, all facts must be viewed in the light most favorable to the non-moving party." *Id.*

### B.  Defendants' Motion

The law cannot solve every problem.  If Plaintiff's version of the facts is <u>entirely</u> credited and Defendant's strenuous denials of Plaintiff's allegations are entirely discredited, as is required under the summary judgment standard, Defendant Brennan saw Plaintiff as the son he never had, and hired him with the hope of transferring the business to him when Defendant – at some indeterminate date – retired.  Unfortunately, that hope diminished as the parties' relationship grew tense and deteriorated over time. Plaintiff pushed for an agreement sooner rather than later, as he had anticipated, but Defendant refused to provide one, all the while keeping Plaintiff's hopes alive with vague reassurances that he was "working on" some form of transition plan documents. Four and a half years later, Defendant not only declined to give Plaintiff the Company, but notified Plaintiff that he was closing his business and would no longer require Plaintiff's services.

In short, Defendant Brennan is alleged to have behaved very badly, even immorally, while Plaintiff continued to toil away and bring in substantial profits for BBI

based on "a series of false promises."  (Doc. 17-1, Ex. 18).  However, the issue before this Court is not whether Defendants treated Plaintiff poorly, or acted immorally.  The law does not provide for civil liability for every occurrence of uncivil or bad behavior. The issue presented here is whether Plaintiff can establish the elements on any of his legal claims, in order to proceed to trial.  Concluding that he cannot, the undersigned recommends that Defendants' motion for summary judgment be granted.

### 1. Breach of Contract For Ownership of BBI

Plaintiff alleges breach of an express and/or implied contract[8] based upon Defendants' alleged failure to transfer ownership of BBI to Plaintiff.  Specifically, he alleges that Defendants "promised Plaintiff that he would become the owner" of BBI, that Plaintiff "accepted Defendants' offer," but that Defendants subsequently "refused to abide by and perform" the alleged "contract."  (Doc. 8 at ¶31).  Earlier in his complaint, Plaintiff alleges that he and Brennan entered into an enforceable contract in February 2006 whereby "Plaintiff would undertake a six-month engagement to work on a building project with Defendants and that thereafter, Brennan Builders would be transitioned to Plaintiff."  (*Id.* at ¶10).

Ohio law requires that, for a contract to be enforceable, it must be "definite and certain," and the parties must have a "meeting of the minds" regarding its essential terms.  *See Episcopal Retirement Homes, Inc. v. Ohio Dept. of Industrial Relations*, 61 Ohio St.3d 366, 369, 575 N.E.2d 134 (1991).  An agreement to make a future agreement is not *per se* unenforceable, but the parties must have manifested an intent

---

[8]Defendants protest that Plaintiff's complaint pleads an "implied-in-fact" contract only as to Plaintiff's continued employment, and not with regard to the ownership of BBI.  However, explicit pleading of an express or implied-in-fact contract is not required under Ohio law.  *B&J Jacobs Co. v. Ohio Air, Inc*, 2003 WL 22103385 at*3, ¶11 (Ct. App. 1st Dist. 2003).

to be bound by its terms, and the terms still must be "sufficiently definite to be specifically enforced." *M.J. DiCorpo, Inc. v. Sweeney*, 69 Ohio St. 3d 497, 503, 634 N.E.2d 203 (1994). In *Sweeney*, for example, the Ohio Supreme Court held that, even though the parties had signed a written letter of intent regarding a possible merger, "the letter itself did not address all of the essential terms of the merger," and therefore was "not a legally enforceable contract." (*Id.*).

Plaintiff argues that genuine issues of material fact preclude summary judgment on his breach of contract claim. Quoting *Arnold Palmer Golf Co. v. Fuqua Industries, Inc.*, 541 F.2d 584 (6th Cir. 1976), Plaintiff maintains that "the question whether the parties intended a contract is a factual one, not a legal one, and, *except in the clearest cases*, the question is for the finder of fact to resolve." *Id.* at 588 (emphasis added). By contrast, Defendant relies on Ohio cases that hold that "[t]he existence of a contract is a question of law*." See, e.g., Union Stock Yards v. Hillsboro,* 191 Ohio App.3d 564, 569 at ¶10, 947 N.E.2d 183, 186 (Ohio Ct. App. 2010)(citing *Telxon Corp. v. Smart Media of Delaware, Inc.,* 2005 WL 2292800 at ¶ 40 (Ohio Ct. App. 2005) and *Hocking Valley Community Hosp. v. Community Health Plan of Ohio,* 2003 WL 21904586 at ¶ 11 (Ohio Ct. App. 2003)). Because it is clear that no contract was formed on the facts presented, summary judgment is appropriate.

A contract may be oral or written. Regardless of form, however, it requires an offer, acceptance, mutual assent, and consideration. *Resource Title Agency v. Morreale Real Estate Servs., Inc.*, 314 F. Supp.2d 763, 769 (N.D. Ohio 2004)(internal citation omitted). Plaintiff's amended complaint alleges that Defendants entered into an oral agreement whereby they "promised Plaintiff that he would become the owner of

[BBI]." (Doc. 8 at ¶31).  Plaintiff testified that the promise/offer was the culmination of discussions made over prior years.  Plaintiff argues that in February 2006, Plaintiff "accepted" the Defendants' oral "offer" to prepare a written agreement to transfer BBI to Plaintiff in the future, at an indefinite time but approximately within two years.  Plaintiff contends that there was mutual assent, and consideration.  However, Plaintiff's claim for breach of contract fails as a matter of law on nearly every element: there was no firm "offer," no mutual assent, and no consideration.

Plaintiff's deposition testimony concerning the date on which the alleged contract was formed – as well as what alleged agreement Plaintiff is seeking to enforce – demonstrates the lack of any firm offer or mutual assent.  Plaintiff variously testified that he seeks to enforce an oral contract concerning the transfer of ownership of BBI, and/or an oral agreement to form a new "LLC" or partnership or joint venture in which Defendant Brennan and/or his wife would continue to have some unstated portion of the ownership, but would "transition" over some undetermined period of years to full ownership by Plaintiff and/or his wife.  In early 2006, Plaintiff testified that he believed that Defendant was to transfer 100% of BBI to him over a timetable spanning approximately two years.  However, in contrast to that alleged belief, he conceded that his employment was for a six-month "trial" period with no guarantee of future employment.  By early 2007, he testified that the agreement had changed to one in which Defendants would form an "LLC" or some other new venture, with uncertain ownership shares, but with a general understanding that Brennan and/or his wife would eventually phase out their ownership interest and leave the new entity entirely to Plaintiff and/or his wife over some indefinite period, possibly two years, or perhaps five

14

years.  Even fully crediting all of Plaintiff's testimony, he has failed to demonstrate any enforceable contract based upon a lack of a firm offer, or mutual assent to the terms.

Nearly all of the cases relied upon by Plaintiff as "primary authorities" contain strong written evidence of the contract at issue.  *See, e.g., Arnold Palmer Golf Co. v. Fuqua Indus., Inc.*, 541 F.2d at 586-88 (six-page "Memorandum of Intent" contained "detailed statements concerning…the manner in which the business would be conducted, the loans that Fuqua agreed to make to Palmer, and the warranties and covenants to be contained in the definitive agreement.").  In the few cases in which an oral contract was at issue, the Ohio courts relied upon evidence of prior similar contracts that permitted the courts to infer the existence of a new contract in keeping with prior practice.  Unlike the numerous cases cited by Defendants, virtually none of the cases relied upon by Plaintiff involve an offer to sell or transfer an ongoing business to an employee on an unspecified future date.

The case on which Plaintiff most heavily relies to support his claim that Brennan made a firm verbal "offer" to transfer the business to him in February 2006, is *Nilavar v. Osborn*, 711 N.E.2d 726, 127 Ohio Ct. App.3d 1 (Ohio Ct. App. 1998).  In *Nilavar,* the court held that the defendant's promise to form a new business group in the future that would include plaintiff had "sufficient clarity" to support a breach of contract claim, notwithstanding the lack of details regarding the form of the entity, plaintiff's status in the group, his rate of compensation and other terms of employment, and the duration of the new relationship.  The court suggested that, in a contract for services, "the essential terms are, generally, the parties to the contract and its subject matter," and are "sufficiently certain if they provide a basis for determining the existence of a breach and

15

for giving an appropriate remedy." *Id*. at 734.

However, *Nilavar* is easily distinguished because it involved a long-standing business relationship in which both plaintiff and defendant were equals - shareholder/radiologist members of group practice called "SRI," whose doctors practiced at separate facilities.  Between 1993 and 1995, defendant agreed to negotiate on behalf of SRI with one of the facilities, Mercy, where he was head of the radiology department.  After those negotiations broke down and Mercy solicited an open offer to all radiology service providers by a date certain, defendant secretly organized a new business entity in which he was the sole shareholder, and submitted a proposal to Mercy on behalf of the new entity – excluding the plaintiff.

At the time, SRI members had voted to dissolve in order to form two new radiology groups, one of which would be comprised of the doctors who practiced at Mercy, for the purpose of submitting a new proposal to Mercy.  Plaintiff testified that the defendant agreed to forward that proposal on behalf of the new SRI "Mercy group," consistent with defendant's prior negotiations with Mercy on behalf of SRI.   SRI minutes stated that defendant said he had "contacted an attorney to begin forming one of the two new entities."  Corporate minutes also reflected the plan to dissolve and form two groups, and stated that defendant would lead the Mercy doctors in presenting a proposal, although the minutes did not confirm that defendant actually *accepted* that task (which defendant denied doing).  Noting that plaintiff's evidence suggested that defendant engaged in deliberate deception by outwardly manifesting assent without intending performance, the court held that "[c]ourts may still find a 'meeting of the minds' even if one party keeps a secret present intention to disregard his obligations

16

under a newly formed contract." *Id.* at 733.

Overturning summary judgment, the *Nilavar* court reasoned defendant's agreement to form a new SRI "Mercy Group" and submit a proposal on their behalf was a "specific enough obligation to create a contract" because of the unique facts and circumstances presented that provided "some reasonable indication of what that obligation would entail." *Nilavar* 127 Ohio App. 3d at 14, 711 N.E.2d at 734, *modified on reconsideration* (May 12, 1998). The court's holding was extremely fact-specific, explaining that an offer "which appears to be indefinite may be given precision by usage or trade or by course of dealing…." *Id.* at 734. The record reflected that the two physicians were both shareholders in the radiology group and "had a long course of dealing during which [defendant] acted as a negotiator" with Mercy on behalf of SRI, including a "draft agreement from SRI's earlier negotiations with Mercy" which indicated "the character of the proposal [defendant] would submit" on behalf of the new physician group. *Id.* at 735 (emphasis added). "Given these indications of what [defendant's] obligation would entail, a reasonable person might conclude from this evidence that a contract existed with sufficient certainty as to its subject matter. Such a possibility precludes the grant of summary judgment for lack of certainty." *Id.*

In addition to the long course of dealing and other factual distinctions just discussed, *Nilavar* is distinguishable based on the "consideration" element of the contract at issue. The *Nilavar* court held that valid consideration existed, because each of the former SRI doctors agreed to be bound by the proposal that defendant was to submit by Mercy's deadline, and would refrain from submitting a competing bid. Critically, the court emphasized that plaintiff and defendant were not "master and

17

servant" but shareholders in the same business entity.  The *Nilavar* court took pains to distinguish the Ohio case law applicable to cases involving employment at will - in which "forbearance from looking for a job [can] not, as a matter of law, constitute consideration."  *Id.* at 735 (emphasis added, internal citations omitted).

Thus, *Nilavar* is distinguishable on every front.  Here, there was no long-standing business relationship in which Defendant had repeatedly engaged in detailed contractual negotiations on behalf of an entity that included Plaintiff.  Rather, the parties began a brand new employment relationship in which Plaintiff agreed in writing to a "trial" period of employment for a mere six months, after which Plaintiff would receive his first review.  While Plaintiff argues that the "contract" was to "transition" 100% of the ownership of BBI to Plaintiff over time, he also admitted that he had no guarantee of employment beyond the six-month period if the professional relationship did not work out.  He described the "agreement" as his expectation that he would receive, after six months, "a letter of intent" that would outline the transition of the business from Defendant to Plaintiff "over the next year and a half or two years."  (Doc. 17, Salyers Depo. at 54-55).  In other words, Plaintiff alleges an oral "agreement" to make a future "letter of intent" or new promise, which itself would be to form another future "transition" agreement over an uncertain period of time.  There was no definite date on which the alleged transfer would occur.  The only written evidence of any agreement was limited to a six-month "trial" period of employment.  Unlike in *Nilavar,* Plaintiff and Defendant were beginning a brand new relationship in which they were not equals, but clearly were "master and servant."

Plaintiff argues that this was a "simple" contract, because BBI was a "simple

business" with just three employees: Brennan's wife Vickie, Blaine Singleton, and Plaintiff. Plaintiff argues that very little written detail in the "transition" document was required, as demonstrated by the one and a half page "Term Sheet" ultimately offered by Brennan in September 2010. However, even Plaintiff believed that a written contract or agreement was required. While Plaintiff claims that "the documentary evidence shows that Plaintiff continually put his request for the [transition] document in writing and that Brennan repeatedly assured Plaintiff that it was forthcoming," (Doc. 29 at 24), the record does not support that assertion.

From the beginning of his "trial period" of employment, Plaintiff sought only a "letter of intent" about a future transition over an indefinite period of time. (Doc. 17 at 54-55). The documentary evidence reflects that Brennan agreed that after six months, the parties would "discuss other options." Thus, at the time Plaintiff accepted the offer of employment, Defendants agreed only to "discuss" undefined future "options." Plaintiff understood his "trial" period of employment included some uncertainty, and that his employment could end. (Doc. 17 at 63-64). Ten months later in February 2007, Plaintiff wrote to request that he and Brennan "begin working together on creating the new business entity and take the necessary steps to make this happen in a mutually agreed upon amount of time." (Doc. 17-1 at 8, emphasis added). Plaintiff's own writing demonstrates that as of February 2007, Plaintiff did not have a unilateral expectation that Brennan had agreed to provide him with a definite agreement to transfer BBI to him at a definite time. Instead, Plaintiff seeks to "begin" working on something that would require future mutual agreement.

A month later, Plaintiff reiterates his request for "a mutually agreed upon time

frame for putting your plans for the future in writing," as well as his request that he "be involved in that process."  The same email complains that Brennan says "less…about it" the more that Plaintiff brings it up.  (Doc. 17-1 at 11).  Again, Plaintiff's own writing confirms the absence of any pre-existing agreement or certainty as to Defendant Brennan's "plans for the future," as well as the absence of any timetable for making those plans.  Plaintiff's next sentence provides even more confirmation of the lack of a firm "offer" to transfer 100% of BBI to Plaintiff:  "If you are not capable of a partnership with me, please say so.  I am not capable of being a long term employee for you……" Thus, Plaintiff's words echo his hope and desire for a "partnership" (rather than full ownership), while concluding with yet another expression of hope (as opposed reliance on any firm plan): "The future could be an amazing thing."  (Id.).

Nearly a year later, in a lengthy and formal letter dated April 18, 2008 that his employer viewed as "legal posturing," Plaintiff expresses his disappointment in the status of the relationship.  Even in this letter, however, it is clear that there was no definite contract in place:  "You once stated that your time frame was two years to be completely out of the picture.  Rather surprised, I appreciatively indicated that I was in no hurry for you to be completely out of the picture…."  The letter proceeds to detail Plaintiff's view of events, focusing on the fact that Brennan continually had refused over the prior two years to put anything in writing concerning the allegedly-promised new business entity that Plaintiff refers to as an "LLC."  Plaintiff lauds his own performance as a faithful BBI employee, noting that he accepted a "$150,000 package, in lieu of the $200,000 I requested," based on Brennan's "assur[ance]" of "a sizeable bonus."  The letter accuses Brennan of being "something other than honest and appreciative" based

on the disappointing size of Plaintiff's bonus check, "combined with the fact that company and project profitability has become none of my business."  (Doc. 17-1 at Ex. 13).   The letter ends with a request that Brennan increase Plaintiff's salary and bonus, and provide "a draft copy of the current LLC documents, and work diligently in good faith to set up the LLC in time to affect all future projects," in keeping with prior "plans to create a partnership." (Doc. 17-1 at Ex. 13).   Several weeks later, Plaintiff sent a contrite follow-up email, with the word "Trust" on the subject line:

> Whether or not you intend to reward my efforts with a bonus, or help me set up my own business entity, please trust that my intentions are not legal.  Insurance to protect against such intentions will not be necessary.  At least as far as I am concerned.
>
> My only intentions have been to give you my best effort and to honor what I thought our agreement was.  All I ask is that you do the same.  I am sorry if, and can see why my recent letter could have been interpreted as legal posturing….

(Doc. 17-1 at Ex. 15).

Two years later, Plaintiff's June 14, 2010 "letter of intent," shows that no firm offer was ever made, nor mutual assent achieved, given that Brennan never agreed that he would give 100% of BBI to Plaintiff.  On its face, Plaintiff's "letter of intent" references only ongoing <u>discussions</u> for Plaintiff to take "more of" an ownership role, but even Plaintiff's "letter of intent" proposes a sale of BBI (albeit one with unusual terms).  Consistent with a letter of intent, Plaintiff proposes that "[u]pon acceptance of the terms of this letter, Purchaser's counsel will prepare a definitive written agreement….." Plaintiff's letter expressly contemplates "continued negotiations" and – importantly - states that "*neither Seller nor Purchaser shall have any obligation or liability to the other, hereunder or otherwise, unless and until a mutually satisfactory Definitive Agreement*

*has been fully negotiated and executed by the parties.*"  (Doc. 17-1 at 16, emphasis added).

Contrary to Plaintiff's view that Defendants' alleged oral reassurances and platitudes should be construed as an enforceable contract, multiple cases cited by Defendants illustrate that Ohio courts consistently have held that similar oral "promises" to sell or otherwise transfer an ownership interest in a company in the future are unenforceable, because "the court would essentially be creating a contract for the parties, since so many essential terms are missing…."  *See e.g., Bliss v. Chandler*, 2007 WL 4098784 (Ohio Ct. App. 2007); *Callander v, Callander*, 2008 WL 2026431, 2008-Ohio-2305 (Ohio Ct. App. 2008)(oral promises by father that he would convey ownership of business to son in future upon his retirement or demise did not create binding contract).  Likewise, and as referenced in *Nilavar*, Ohio courts have held that an employee's compensated services cannot serve as consideration for an alleged oral contract granting that employee an ownership interest in the business.  *See Reif v. Wagenbrenner*, 2011 WL 2905587, (Ohio Ct. App. 2011); *Nye v. Kutash*, 2009 WL 478227 (Ohio Ct. App. 2009).

While Plaintiff alleges that the parties had an oral agreement to make a future written agreement, it is abundantly clear from Plaintiff's own testimony and documentary evidence that neither the terms nor the timetable of any future agreement were clear. Enforcement of an implied or express contract involving the transfer of ownership in a business requires much more certainty under Ohio law.   Last but not least, as in *Reif* and *Nye*, Plaintiff provided no recognizable legal consideration for the alleged agreement, and suffered no legal detriment, since he received an ongoing salary at BBI,

plus bonuses, that exceeded his compensation from any prior employment.

In an effort to distinguish the facts presented from the Ohio cases that hold that continuation of an employment relationship does not equal consideration, Plaintiff argues that it was not the continuation of his employment, but his initial acceptance of the written offer of a six-month trial period of employment that constitutes consideration, because that offer included the alleged oral promise of a "transition of ownership." Plaintiff's argument conveniently ignores the bolded language of the written offer.  More importantly, for all the reasons discussed above, the undersigned finds no reasonable jury could find that a firm offer was made, or that Brennan and Plaintiff ever reached mutual assent or a meeting of the minds on the issue.

### 2. Promissory Estoppel Claim

In order to prove a promissory estoppel claim under Ohio law, Plaintiff must show:

> (1) a clear and unambiguous promise; (2) reliance on the promise; (3) the reliance is reasonable and foreseeable; and (4) the party relying on the promise was injured by his or her reliance.

*Dunn v. Bruzzese*, 172 Ohio App.3d 320, 329 at ¶ 21,  874 N.E.2d 1221, 1227 (Ohio Ct. App. 2007)(internal citation omitted).   Ohio courts have held that "reliance on a statement of future intent made prior to the conclusion of negotiations in a complex business transaction is unreasonable as a matter of law."  *Mansfield Square Ltd. v. Big Lots, Inc.*, 2008 WL 5159930 (Ohio Ct. App. 2008)(internal quotation marks and citation omitted); *Carcorp, Inc. v. Chesrown Oldsmobile-GMC Truck, Inc.*, 2007 WL 259248 (Ohio Ct. App. 2007).  In *Mansfield Square*, the court held that it was not "reasonable" for the plaintiff to rely on letters of intent, when the parties exchanged letters that

indicated that they did not intend to be bound until a lease was executed.  *See also Carcorp, Inc.*, 2007 WL 259248 at *33 (finding it unreasonable for party to rely on promise to sell that "was, at most, a promise to pursue a formal asset purchase agreement.").

Plaintiff relies heavily on *Mers v. Dispatch Printing Co.*, 19 Ohio St.3d 100, 483 N.E.2d 150 (1985), a case not involving the transfer of a business ownership, but instead an employee's suit for wrongful termination.  *Mers* was focused on recognizing an exception to the doctrine of employment at will.   "[T]here are occasions when exceptions of the general rule [employment-at-will] are recognized in the interest of justice."  *Id.* at 103.  Mr. Mers had been arrested and tried on rape charges, during which his employment was suspended.  His employer promised that he would be reinstated with back pay if the charges were "favorably resolved."   However, the employer later represented that it intended reinstatement only if plaintiff were acquitted. Plaintiff was terminated after his criminal case resulted in a hung jury.  In reversing the trial court's grant of summary judgment, the appellate court held that a factual issue remained as to whether the employer should have reasonably expected plaintiff to believe that he would be reinstated based upon the hung jury, thus permitting proof of promissory estoppel to alter the "at-will" employment relationship.

As with his reliance on *Nilavar*, Plaintiff's reliance on *Mers* is misplaced.  *Mers* did not hold that a question of fact exists in every case in which a promissory estoppel claim is asserted.  Here, Plaintiff asserts reliance on nothing more than an oral promise of an entirely undefined future "letter of intent" which would lay the foundation for a future agreement.  Plaintiff concedes that Defendant provided absolutely nothing in

writing (repeatedly refusing to do so), and further, that Brennan never even verbally agreed to what Plaintiff believed to be the "terms" of their alleged "agreement" – that he would transfer 100% ownership of BBI or some future entity to Plaintiff for no further consideration than his loyalty and prior employment. (Doc. 17 at 152-153). Plaintiff's own writings demonstrate the lack of any "clear and unambiguous promise." While Plaintiff alleges that Defendant repeatedly made verbal "promises" that he would work on, or was in the process of working on, some type of written agreement, none was ever provided despite Plaintiff's periodic requests over more than four years. (*See, e.g.*, Doc. 17-1, Ex. 10, Plaintiff's April 2007 notation that Defendant told him he was working on his "4th draft" of an undefined document). Plaintiff was well aware that he needed a written document, but the more that he brought up the topic, "the less" Brennan would say. (Doc. 17-1, Ex. 11). As a matter of law, Plaintiff's alleged "reliance" on Defendant's vague and unfulfilled promises, over a four-year period of employment, to transfer ownership of BBI in some undetermined and ever-changing fashion – with no certainty even as to the number of years over which the transfer would occur - was not reasonable.

The undersigned further agrees that Defendant is entitled to summary judgment because Plaintiff suffered no injury as a result of his alleged reliance.[9] Plaintiff cites *Helmick v. Cincinnati Word Processing, Inc.*, 45 Ohio St.3d 131, 135-36, 543 N.E.2d 1212, 1216 (1989), but in that case, the Ohio Supreme Court reiterated: "There is no question that, standing alone, praise with respect to job performance and discussion of

---

[9]Plaintiff argues in part that his wife gave up a lucrative job in Michigan to move with him to Cincinnati. Quite apart from the evidence that she gave up her position for other reasons, Plaintiff's wife is not a party to this action. Plaintiff cannot claim as his own his wife's allegedly detrimental reliance on promises that Defendants allegedly made to Plaintiff.

future career development will not modify the employment-at-will relationship." *Id.* (footnote and additional citations omitted). *Helmick* involved an exception to that rule. There, the plaintiff was a former employee who sued for breach of an employment contract, among other claims, after allegedly being subjected to a pattern of sexual abuse. The plaintiff offered specific evidence that she had been interviewing with multiple employers and that defendant promised her job security and opportunities for advancement "in consideration of her discontinuing her other interviews." After plaintiff became dissatisfied and began a new job search, defendant again dissuaded her by telling her that a raise had been approved and that her career would continue. "Based on this reassurance, Helmick stopped looking for other jobs and may have….rejected another job offer." *Id.* at 136. In other words, in *Helmick* the defendant expressly asked plaintiff to discontinue her active job search, and there was evidence she rejected another offer based upon her employer's express promises. In a split opinion, the majority held that plaintiff had put forth sufficient evidence to defeat summary judgment, since "[a] demonstration of detrimental reliance on specific promises of job security can create an exception to the employment-at-will doctrine." *Helmick*, 45 Ohio St. 3d at 136, 543 N.E.2d at 1217.

In contrast to the facts presented in *Helmick*, Plaintiff was admittedly unemployed at the time he accepted BBI's 2006 offer of employment and had no other job offers. BBI did not ask him to quit an active job search or turn down other opportunities. In fact, Plaintiff never sought any other employment, from the time he received the offer of a six-month "trial" period with BBI through the termination of his employment with BBI. *See Rogers v. National City Corp.*, 20009 WL 1622382 (Ohio Ct. App.

2009)(unemployed plaintiff who never received another job offer, and who was well compensated during his employment with defendant, suffered no detrimental reliance); *accord Nilavar v. Osborn*, 127 Ohio Ct. App.3d at 18 ("an at-will employee who claims reliance in not looking for other work cannot distinguish himself from one who merely continues working normally."); *Stickler v. KeyCorp,* 2003 WL 157388 (Ohio Ct. App. 2003)("Detrimental reliance does not exist where the promise merely refrains from seeking other employment unless he rejects an offer."); *Hanly v. Riverside Methodist Hosp.*, 78 Ohio App.3d 73, 80, 603 N.E.2d 1126 (Ohio Ct. App. 1991)(Plaintiff did not suffer detrimental reliance when he "neither looked for employment outside the hospital...nor turned down any offer of employment after the alleged representations were made"); *Wing v. Anchor Media, Ltd. Of Texas*, 59 Ohio St. 3d 108, 110-111, 570 N.E.2d 1095 (1991)(promise of future equity in company was not promise of continued employment, and "merely turning down other employment inquiries does not present a jury question of substantial detrimental reliance").

### 3. Fraud Claim

Like the claim of promissory estoppel, a claim for fraud under Ohio law requires justifiable reliance on the alleged false representations plus "a resulting injury proximately caused by the reliance."  *See, e.g. Gaines v. Preterm-Cleveland, Inc.*, 33 Ohio St. 3d 54, 55 (1987).  As one Ohio court recently put it:

> Reliance is justifiable if the representation does not appear unreasonable on its face and *if there is no apparent reason to doubt the veracity of the representation under the circumstances. Lepera v. Fuson* (1992), 83 Ohio App.3d 17, 26, 613 N.E.2d 1060, 1065–1066. However, there must be a balance between reliance and responsibility:
>
> "The rule of law is one of policy and its purpose is, while suppressing fraud on the one hand, not to encourage negligence and inattention to one's

27

own interests. *There would seem to be no doubt that ....in ordinary business transactions, individuals are expected to exercise reasonable prudence and not to rely upon others with whom they deal to care for and protect their interests....*"

*Turtutici Family Trust v. Carey*, 2012 WL 6738375 at *7, ¶ 34 (Ohio Ct. App. 2012)(emphasis added, quoting *Amerifirst Sav. Bank of Xenia v. Krug*, 136 Ohio App.3d 468, 495-496, 737 N.E.2d 68 (Ohio Ct. App. 1999)).

For all of the reasons previously discussed, Plaintiff's fraud claim fails as a matter of law. There was ample reason to question the veracity of the alleged "representation" from the outset of Plaintiff's six-month "trial" period of employment, after which Plaintiff acknowledged he could have found himself unemployed (and presumably without the promised future ownership interest).  As time went on, new reasons became apparent to distrust the alleged "promises" to make some future agreement – the lack of any definite terms, the lack of any forthcoming agreement, the growing mistrust between the parties, and Plaintiff's own well-documented anxiety and lack of faith that things would work out.  (*See* Doc. 17-1, Ex. 9 at 2, Plaintiff's typed note to himself expresses "a new found sense of anxiety associated with my trusting that this would work out.").  In short, Plaintiff cannot recover on a fraud claim because his alleged reliance was not justified as a matter of law.

### 4.  Implied Contract Relating to Continuation of Employment

Ohio adheres to a strong presumption favoring employment at will.  *Henkel v. Educ. Research Council of America,* 45 Ohio St. 2d 249, 254-55, 344 N.E.2d 118 (1976).  Plaintiff alleges in Count III that his employment was not at-will, because Defendants entered into an "implied-in-fact contract" that limited Defendants' right to terminate him except for "just cause."  (Doc. 29 at 35; Doc. 8 at ¶33).  In order to

establish his claim that he was wrongfully terminated without just cause in September 2010, Plaintiff must prove that the "circumstances surrounding the parties' transaction make it reasonably certain they intended to enter into an agreement." *State ex rel. Bayus v. Woodland Park Props., Ltd.*, 2007 WL 1805805 at *4, ¶23 (Ohio Ct. App. 2007).

Plaintiff has failed to overcome the presumption of at-will employment, or to show circumstances that could reasonably support his claim of an agreement to continuously employ him.  Plaintiff testified that he was relying on alleged statements by Brennan after Plaintiff began his employment that "as long as he had work," Plaintiff would remain employed, and that "as long as Brennan Builders was in business, he would take care of me."  (Doc. 17 at 126).  But neither of these vague statements as a matter of law can create an enforceable contract that Plaintiff could only be discharged for just cause. The limited exceptions to Ohio's "employment at will" doctrine, as set forth in cases like *Mers* and *Helmick*, make clear that modification requires a specific promise by the employer.  In this case, there is no evidence – either oral or written – that would provide <u>reasonable</u> grounds for Plaintiff to believe that he had any type of permanent employment contract.  Plaintiff affirmatively testified that he had no formal "agreement with Mr. Brennan that [his] employment would never end," but only "assurance that as long as he had work, you know."  (*Id.*).

Plaintiff's 2006 employment agreement was in writing, and clearly spelled out the term as a six month "trial" period, with a review at the end of that period, at which time Plaintiff acknowledged his employment could "go one way or the other."  (*Id.* at 64). Plaintiff's initial application expressly informed him that only a "writing…signed by an

authorized company representative" could guarantee him employment for any specific period of time.  (Doc. 17-1, Ex. 4).  In *Wing*, a case decided after both the *Mers* and *Henkel* cases on which Plaintiff relies, the Ohio Supreme Court reiterated that a written disclaimer like the one in Plaintiff's employment application generally "bars the finding of a contract of employment other than an at-will relationship.  59 Ohio St. 3d at 110.  The only other written agreement pertaining to Plaintiff's employment was the compensation package offered to Plaintiff in early 2007.  However, neither the document pertaining to that package nor any other writing evidences any type of permanent employment.

Plaintiff relies on *Atkinson v. Internat'l Technegroup, Inc.*, 106 Ohio App.3d 349, 666 N.E.2d 257 (Ohio Ct. App. 1995), a case in which a jury found for an employee on his state law age discrimination claim against his former employer.  The appellate court affirmed the verdict on both the primary age discrimination claim and on a second claim for breach of express or implied employment agreement.  The court noted testimony from management that company policy was to conduct periodic performance reviews, to have "good reason" before terminating any employee, to treat employees "fairly," and to provide an employee about to be terminated "as much notice as possible."  The plaintiff was aware of the policies, which the defendant violated in terminating plaintiff.

Unlike *Atkinson*, Plaintiff here offers no similar course of dealing of explicit or implicit policies by Defendants demonstrating a historical course of conduct, whereby they would not terminate the employment of other employees absent "just cause."  For the reasons previously discussed, Plaintiff had no reasonable expectation that his employment could not be terminated so long as BBI remained in existence.  *Contrast Kelly v. Georgia-Pacific Corp.*, 46 Ohio St.3d 134, 545 N.E.2d 1244 (1989)

(representations made to salesman in performances reviews, repeated references to specific statements in employee manual, and correspondence from management officials were reasonably interpreted as providing implied contract of continued employment sufficient to proceed to jury).

### 5. Public Policy Claim

To prevail on his claim that he was terminated in violation of public policy, Plaintiff must show:

> (1) the existence of a clear public policy manifested in constitutional, statutory, regulatory, or common law; (2) the circumstances of the discharge undermine or jeopardize the public policy; (3) the discharge was for reasons related to the policy; and (4) there was no overriding legitimate basis for the discharge.

*Krickler v. City of Brooklyn*, 149 Ohio App.3d 97, 102 ¶13, 776 N.E.2d 119, 122-23 (Ohio Ct. App. 2002).

Plaintiff alleges that even if he was employed at-will, he was terminated in violation of public policy for consulting an attorney.  In *Chapman v. Adia Servs., Inc.*, 116 Ohio App.3d 534, 544, 688 N.E.2d 604 (Ohio Ct. App. 1997), the Ohio Court of Appeals recognized a public policy exception when an at-will employee, during an off-site visit to her employer's client, fell and seriously injured her knee. The plaintiff alleged that she was wrongfully terminated for consulting an attorney regarding the merits of a potential personal injury claim against her employer's client.  *Id.* at 538, 540.  However, in a later case, when asked to extend the exception to an employee suing her employer (as opposed to a third party), the same court declined to do so, reasoning:  "[A]n employee's need for access to legal representation does not necessarily entail the right to file suit against his employer.*"  Taylor v. Volunteers of Am.*, 153 Ohio App.3d 698,

702, 795 N.E.2d 716 (Ohio Ct. App. 2003).  Thus, no public policy violation exists "when an employer terminates an employee for consulting and/or retaining an attorney with regard to the employee's own business interests."  *Popp v. Integrated Elec. Servs., Inc.*, 2005 2488050 (Ohio Ct. App. 2005)(rejecting public policy claim where employee was terminated for consulting an attorney regarding a business dispute between himself and his employer); *see also Neely v. Crown Solutions Co.*, LLC, 2014 WL 1091977 (S.D. Ohio 2014)(holding that public policy claim survived because plaintiff/employee alleged that he was consulting counsel in connection with his responsibilities as CEO, and not in a manner that was for his personal benefit rather than for the company's benefit).

Here, as a matter of law, there is no clear public policy in Ohio that supports Plaintiff's wrongful termination claim.  Plaintiff alleges that he was fired for consulting with an attorney about matters "directly related to Plaintiff's employment" as in *Neely*, but the undisputed evidence is that the purpose of his consultation was to further his own business interests, and to sue his employer if he deemed it necessary to adequately pursue those interests.  The record reflects that Defendants took no adverse action against Plaintiff in the spring of 2010, despite learning almost immediately that he had consulted counsel.  It was not until September, after Plaintiff had made clear that he intended to pursue interests adverse to Defendants' business interests, that Plaintiff was terminated. "There is no clear public policy in Ohio to protect an employee from termination when the employee consults an attorney to protect his own business interests against those of his employer, especially when that consultation leads to an adversarial position and the threat of litigation against his employer."  *Popp,* supra at *4, ¶17.

In the event that a reviewing court would find the existence of some public policy in Ohio that would preclude termination based upon Plaintiff's consultation of counsel, the undersigned alternatively concludes that Defendant is entitled to judgment based upon the lack of proof of causation, as well as the undisputed evidence of an "overriding legitimate basis" for the termination of Plaintiff's employment.  After Defendant failed to respond to Plaintiff's June 14, 2010 letter of intent, in August 2010, Plaintiff accused Defendant of making "false promises" and charged that BBI had "liability" with him.  It was not until September 2010, *after* Plaintiff made those charges, that Defendants responded with a counter-offer either to sell BBI to Plaintiff at a price significantly higher than Plaintiff had proposed, or to close the business and terminate Plaintiff's employment.  The clearly adversarial nature of the parties' relationship by that point provided an overriding legitimate basis on which to terminate Plaintiff's employment, thus rebutting any presumption that the termination was in violation of public policy. *See Hale v. Mercy Health Partners*, 20 F.Supp3d 620, 643 (S.D. Ohio 2014)(plaintiff had not "met her burden of proving pretext" in her public policy claim); *Bickley v. FMC Technologies, Inc.*, 282 F. Supp.2d 631, 642-43 (N.D. Ohio 2003)(granting summary judgment and finding plaintiff "produced no evidence of the causation or overriding justification elements" of his public policy claim).

### 6.  Alter Ego Theory

Defendants additionally argue that summary judgment should be granted on Plaintiff's claim that Brennan can be held individually liable as the "alter ego" of BBI. There is no need to reach this argument in light of the fact that Defendants are entitled to judgment as a matter of law on all claims for the reasons discussed above.

However, in the interest of completeness, the undersigned agrees with Defendant Brennan that he is entitled to judgment even if any claim were to remain against BBI. Defendants pointedly note that Plaintiff did not sue Brannan individually in state court, or include Brennan as a defendant in this court until he learned from defense counsel that BBI had been dissolved. "[P]iercing the corporate veil is the rare exception" under Ohio law, and should only occur when shareholders "abuse the corporate form to commit acts that are as objectionable as fraud or illegality." *Dombroski v. Wellpoint, Inc.*, 119 Ohio St.3d 506, 512-513, 895 N.E.2d 538 (2008). There is no evidence whatsoever that Brennan used the corporate form of BBI in order to defraud Plaintiff. Defendants point to Brennan's unrebutted testimony that he held annual, albeit informal, directors' meetings with BBI's outside accountant, and that corporate funds were never commingled with his personal funds. (Doc. 19 at 26-27, 31-32). Defendants note the absence of evidence of undercapitalization, as Brennan also testified that all creditors were timely paid. (*Id.* at 16). Plaintiff himself testified that he has no evidence that BBI wasn't properly incorporated, and Plaintiff has no evidence or information that funds were comingled in any manner, or that creditors were unpaid (other than Plaintiff's own claims).

### III. Conclusion and Recommendation

For the reasons explained above, IT IS RECOMMENDED THAT: Defendants' motion for summary judgment (Doc. 22) be GRANTED; that judgment be entered in favor of the Defendants; and that this case be CLOSED.

 *s/ Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

STEVEN SALYERS,                                           Case No. 1:13-cv-392

               Plaintiff,                                 Dlott, J.
     v.                                                      Bowman, M.J.


BRENNAN BUILDERS, INC., et al.,

              Defendants.


**NOTICE**

Pursuant to Fed. R. Civ. P 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).

35